SO ORDERED.

Dated: November 16, 2016

Daniel P. Collins, Chief Bankruptcy Judge
_____

# U.S. BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>**ROYLE DUFF SCHMIDT and NATALIE SCHMIDT,**<br>      Debtors.<br><br>**LAURA CRUZ,**<br>      Plaintiff,<br><br>    v.<br><br>**ROYLE DUFF SCHMIDT and NATALIE SCHMIDT**,<br>      Defendants. | Chapter 7 proceedings<br><br>Case No.: 2:13-bk-18884-DPC<br><br>Adversary No. 2:14-ap-00018-DPC<br><br>**UNDER ADVISEMENT DECISION DETERMINING DISCHARGEABILITY OF DEBT**<br><br>**(Not for Publication- Electronic Docketing ONLY)** |

Before the Court is the adversary complaint of Laura Cruz ("Plaintiff" or "Ms. Cruz") against Debtors Royle Duff Schmidt and Natalie Schmidt ("Debtors" or "Mr. Schmidt" and "Natalie") seeking to declare nondischargeable certain claims asserted by Ms. Cruz against the Debtors. As more fully discussed below, this Court finds Natalie and the marital community of Natalie and Mr. Schmidt are liable to Ms. Cruz in the amount of $49,999 plus interest at the federal rate (see 28 U.S.C. § 1961) from October 30, 2013 ("Petition Date").[1] The Court further finds that this debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[2]

---

[1] This Order sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

[2] Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code ("Code"), 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1

## I. BACKGROUND

### A. Administrative Case History

1. Debtors filed their voluntary Chapter 7 bankruptcy petition on the Petition Date (Administrative Docket Entry 1).

2. Schedule F of Debtors' bankruptcy schedules reflect a non-contingent, liquidated and undisputed community obligation owed by the Debtors to "Laura Cruz Acre" in the amount of $49,999 as of the Petition Date (Administrative Docket Entry 1, page 27 of 68).

3. Schedule F also lists real property located at 464 West Sagebrush, Gilbert, Arizona 85233 ("Sagebrush Property") as community property of the Debtors. (DE 1, page 12 of 68).

### B. Adversary Proceeding History

4. On January 6, 2014, Ms. Cruz filed her adversary complaint against the Debtors seeking to hold their obligations to her nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6). (Adversary Docket Entry 1).[3]

5. Debtors filed their answer to Plaintiff's complaint on February 20, 2014 (DE 5).

6. The parties filed their Joint Pretrial Statement on September 16, 2016 (DE 39).

7. The trial of this matter was held on September 21, 2016. At trial, the Court heard testimony from Ms. Cruz, Mr. Schmidt, and Natalie. All exhibits submitted at trial were, by agreement of the parties, admitted into evidence.

8. After the close of evidence, counsel for Plaintiff and Debtors presented closing arguments to the Court. During closing arguments, counsel for

---

[3] DE shall hereafter refer to docket entries in the adversary file in this case.

2

Ms. Cruz acknowledged Plaintiff did not have a basis for any claims against Mr. Schmidt individually nor did Plaintiff have a basis for relief against Natalie under §§ 523(a)(4) or (6). Each of those claims were orally withdrawn by Plaintiff without objection by Debtors. By agreement of the parties, Ms. Cruz's sole remaining claim for relief is against Natalie and her marital community with Mr. Schmidt, and only on Ms. Cruz's claims under § 523(a)(2)(A). Accordingly, the Court dismisses with prejudice Counts Two and Three of Ms. Cruz's complaint and Count One as to the sole and separate obligations of Mr. Schmidt only.

C.  Findings of Fact

1.  Natalie and Ms. Cruz became friends in 2001. They went to the same church and often helped one another in many ways. Ms. Cruz frequently took care of Natalie's children. By 2007, Natalie and Ms. Cruz were extremely close friends.

2.  In 2007, both Ms. Cruz and Natalie were single (divorced) women. Natalie did not own the home she was living in. She was desperate to find stable living quarters for her and her children and to find a man she could marry. Natalie sought to purchase a home in 2007 but her financing application was rejected. Since she was dating Mr. Schmidt at the time, she approached him about purchasing a home in his name. He agreed to do so when she was able to come up with the down payment. Natalie sought the down payment from Ms. Cruz through a loan in the amount of $69,000. Natalie knew Ms. Cruz did not have sufficient cash on hand to loan her $69,000 and that Ms. Cruz would need to borrow the funds from Ms. Cruz's Home Equity Credit Line ("HECL"). Ms. Cruz borrowed $69,000 from her HECL and, at Natalie's direction, forwarded the funds by wire transfer to Margaret Schmidt ("Margaret"), a Utah resident, BYU employee and the mother of Mr. Schmidt. At that time, Ms. Cruz had never heard of Margaret nor had she ever met or communicated with Mr. Schmidt. Ms. Cruz loaned the $69,000 to Natalie to

3

help out her good friend because Natalie told Ms. Cruz she would repay this loan in a couple of weeks. Natalie did not tell Mr. Schmidt or Margaret how she came up with the $69,000 nor did she tell Ms. Cruz that these funds were to be transferred by Margaret to an escrow account as a "gift" to Mr. Schmidt to enable him to purchase in his name alone the Sagebrush Property.

3. Upon receipt of Ms. Cruz's $69,000 wire transfer on March 16, 2007, Margaret, in turn, wired these funds as a "gift" to her son, enabling him to make the down payment needed to purchase the Sagebrush Property. He also borrowed the sum of $244,800 from ING Bank ("Bank") which then took a first lien in this amount against the Sagebrush Property. Mr. Schmidt's purchase of the Sagebrush Property closed on or about March 30, 2007. Natalie testified she told the Bank that the $69,000 came from her to Margaret and the Bank agreed this was fine. The Court finds this testimony was not credible nor did the Court find it credible when Natalie testified this scheme was suggested to her by Ms. Cruz.

4. The $69,000 loan by Ms. Cruz to Natalie did not have a stated maturity date or interest rate nor was collateral ever given to secure this obligation. While there was testimony and lawyer references to a promissory note memorializing this obligation, no note was presented to the Court or admitted into evidence. Since Ms. Cruz was told the loan would be repaid in a "couple of weeks," Ms. Cruz was not initially intending to charge Natalie interest on this loan.

5. When Natalie failed to repay the $69,000 loan in a "couple of weeks," as promised by Natalie, Ms. Cruz had Natalie pay Ms. Cruz's monthly HECL loan payment. Natalie paid most of the HECL monthly loan payments for several years. Those payments tailed off, however, when Mr. Schmidt lost his job. The last payment by Natalie was approximately May 31, 2013, about the same time Ms. Cruz sued the Debtors in state court. Debtors filed bankruptcy before that state court action was concluded.

4

6. Although contradicting evidence was submitted to the Court, the Court finds a total of $49,324.86 was paid by Natalie toward Ms. Cruz's HECL. This Court need not determine what portion of these payments was applied to Ms. Cruz's interest obligations and what amount reduced the principal balance on the $69,000 borrowed on her HECL. No other consideration was transferred by Natalie or Mr. Schmidt to or for the benefit of Ms. Cruz.

7. Evidence submitted at trial conflicted on the question of the balance owed to Ms. Cruz. The Court finds Debtors' Schedule F acknowledges the sum of $49,999 was owed to Ms. Cruz as of the Petition Date and that this sum is an obligation of the marital community of Natalie and Mr. Schmidt. Since the obligation to Ms. Cruz was originally the sole and separate obligation of Natalie (then and now an Arizona resident), this Court finds that, after Natalie and Mr. Schmidt married, the obligation was assumed by their marital community as an obligation of their community under Arizona community property laws. This debt assumption by the marital community is confirmed by Schedule F of Debtors' bankruptcy schedules.

8. The Court finds the $69,000 transferred by Ms. Cruz to Margaret was not a gift to Margaret but, rather, a transfer to Natalie to be held by Margaret in trust until Margaret, per Natalie's direction, gifted Natalie's $69,000 to Mr. Schmidt. The $69,000 was never Margaret's property and could not be "gifted" by her to her son. The Court also finds that Ms. Cruz had no idea, until years after her loan to Natalie, that Natalie had the $69,000 transferred by Margaret to an escrow account to enable Mr. Schmidt to acquire the Sagebrush Property in his name alone. Although Natalie testified that she told Ms. Cruz the $69,000 loan proceeds were to go to Mr. Schmidt to enable him to purchase the Sagebrush Property, this Court finds Natalie's testimony is not credible in this regard.

9. Several weeks passed after Ms. Cruz's March 16, 2007 loan to Natalie but Natalie failed to make good on her promise to repay the $69,000 loan in a

5

"couple of weeks." Ms. Cruz became alarmed because she could not alone afford to service her HECL obligation. Ms. Cruz began pressing Natalie for a program that could result in full repayment of Natalie's obligation to Ms. Cruz. Ms. Cruz worked closely with Natalie's real estate agent to assist in the sale of Natalie's Camarillo, California rental property. The Camarillo Property was eventually lost to foreclosure during the residential real estate crisis of 2008 and following.

10. Ms. Cruz contends she had to sell her own California rental property because Natalie failed to timely pay off the $69,000 loan to her. This Court finds any economic hardship suffered by Ms. Cruz was due to her lending money to Natalie which Ms. Cruz could ill afford to lend. Natalie's community is liable to Ms. Cruz for the unpaid principal balance of the $69,000 loan (i.e. $49,999) but not for any portion of any loss claimed by Ms. Cruz due to the sale of Ms. Cruz's rental home.

## II. JURISDICTION

This adversary proceeding is a core matter over which the Court has jurisdiction. 28 U.S.C. §§ 157(B)(2)(1) and 1334. See Plaintiff's complaint at paragraph 1 (DE 1) and Debtors' answer at paragraph 1 (DE 5).

## III. ISSUES

Has Plaintiff proven by a preponderance of the evidence that her claims against Natalie, and her marital community with Mr. Schmidt, are nondischargable under § 523(a)(2)(A) of the Code?

. . .

. . .

. . .

. . .

## III. LAW

### *Section 523(a)(2)(A)*

Under § 523(a)(2)(A), a debt is nondischargeable "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -- false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To show fraud under § 523(a)(2)(A) a plaintiff must show: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained damage as the proximate result of the representation. *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010). "The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence." *In re Weinberg*, 410 B.R. 19, 35 (9th Cir.BAP 2009). A person rarely admits to fraudulent conduct. *In re Golchin*, 175 B.R. 366, 367-68 (Bankr. S.D. Cal. 1993). Accordingly, a court can turn to circumstantial evidence or inferences drawn from a debtor's course of conduct to determine a debtor's intent. *In re Barrack*, 217 B.R. 598, 607 (9th Cir. BAP 1998). When read together, elements (1), (2) and (3) mean that a creditor must establish "evidence, that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor." *In re Brown*, 217 B.R. 857, 860-861 (Bankr. S.D. Cal 1998).

## IV. ANALYSIS

Natalie represented to Ms. Cruz that she needed $69,000 to make the down payment on a home **Natalie** was buying in Arizona. She also represented to Ms. Cruz that she would repay that loan in a couple of weeks. Natalie knew both of these representations were false. Further, the representations were made with the intention and purpose of

deceiving Ms. Cruz so Ms. Cruz would loan Natalie the $69,000 to enable Mr. Schmidt to buy the Sagebrush Property. Ms. Cruz relied on these representations by Natalie. But for these representations, Ms. Cruz would not have loaned any money to her good friend Natalie. Natalie knew or should have known this fact. Ms. Cruz's damages totaled $49,999 as of the Petition Date. Those damages were a proximate result of Natalie's misrepresentations to Ms. Cruz.

Due to the extremely close friendship between Natalie and Ms. Cruz in 2007, this Court finds it was reasonable for Ms. Cruz to have relied on Natalie's promise to repay the $69,000 loan within a "couple of weeks." Ms. Cruz knew Natalie owned and was selling the Camarillo rental property and had been informed by Natalie that she had funds in a QDRO, had a source of income, life insurance, retirement assets and the prospect of an inheritance. Ms. Cruz was told by Natalie that, if she was going to succeed in purchasing the Sagebrush Property, she had to close on that purchase before she would have sufficient cash available to pay the down payment. Ms. Cruz relied on these representations and was reasonable in doing so. Under the circumstances, Ms. Cruz did not act unreasonably by failing to further investigate Natalie's financial condition. It was also reasonable for Ms. Cruz to believe that the Sagebrush Property was purchased by Natalie and Natalie alone. Natalie could possibly obtain an equity loan on the property once Natalie purchased the Sagebrush Property. That home equity loan could then wholly or partially repay Ms. Cruz. Once Natalie failed to satisfy Ms. Cruz's short term loan within a couple of weeks of March 16, 2007, it was reasonable for Ms. Cruz to actively work with Natalie's real estate agent in an effort to sell the Camarillo property. While it was by no means what Ms. Cruz initially bargained for, she made the best of a bad scenario by getting Natalie to service Ms. Cruz's HECL until some other program could be devised to pay off Natalie's debt to Ms. Cruz.

## V. CONCLUSION

Counts Two and Three of Plaintiff's Complaint, as well as Count One against Mr. Schmidt individually, are hereby dismissed with prejudice. Further, Ms. Cruz has demonstrated to this Court by a preponderance of the evidence that the $49,999 obligation owed by Natalie and the marital community consisting of Natalie and Mr. Schmidt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A). Ms. Cruz is hereby directed to lodge with this Court a form of judgment consistent with this Order which judgment shall include an award of interest from the Petition Date at the federal rate found at 28 U.S.C. § 1961.

**So ordered.**

**SIGNED AND DATED ABOVE.**

COPY of the foregoing mailed by the BNC and/or
sent by auto-generated mail to interested parties.

Mark B. Pyper
Owens & Pyper PLC
3030 N. Central Ave., Suite 1406
Phoenix, AZ 8501

Robert R. Teague
Teague Law Firm
2020 N. Central Ave., Suite 1010
Phoenix, AZ 85004